**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

<table>
<tr><td>

MARKING OBJECT VIRTUALIZATION
INTELLIGENCE, LLC,

*Plaintiff,*

v.

NEC CORPORATION AND
NEC CORPORATION OF AMERICA.

*Defendants.*

</td><td>

Civil Action No._____


**JURY TRIAL DEMANDED**

</td></tr>
</table>

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Marking Object Virtualization Intelligence, LLC ("MOV Intelligence" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent Nos.: 6,802,006 ("the '006 patent"); 6,510,516 ("the '516 patent"); 7,650,504 ("the '504 patent"); and 7,650,418 ("the '418 patent") (collectively, the "patents-in-suit" or the "MOV Intelligence Patents").  Defendants NEC Corporation and NEC Corporation of America (collectively, "NEC" or "Defendant") infringes each of the patents-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*

## INTRODUCTION

1.     MOV Intelligence and its wholly-owned subsidiary, MOV Global Licensing LLC ("MOV Global Licensing") pursues the reasonable royalties owed for NEC's unauthorized use of patented groundbreaking technology both here in the United States and throughout Europe.

2.     Rovi Corporation ("ROVI") [1] is a pioneer and leader in protecting computer technology, including digital rights management ("DRM") and digital watermarking systems.

_____

[1] On April 29, 2016, Rovi Corporation acquired TiVo, Inc. The combined company operates under the name TiVo, Inc.

Rovi assigned MOV Intelligence rights to over 233 patents including many of John O. Ryan's, the founder of Rovi predecessor Macrovision, groundbreaking patents.[2]

## THE PARTIES
### MARKING OBJECT VIRTUALIZATION INTELLIGENCE, LLC

3.     Marking Object Virtualization Intelligence, LLC ("MOV Intelligence") is a Texas limited liability company with its principal place of business located at 903 East 18th Street, Suite 217, Plano, Texas 75074.  MOV Intelligence is committed to advancing the current state of DRM and watermarking technologies.

4.     MOV Intelligence Global Licensing, LLC ("MOV Global Licensing") is a wholly-owned subsidiary of MOV Intelligence and assists in the licensing of MOV Intelligence's patents in territories outside the United States with a focus on the European Union (and the United Kingdom).[3]  MOV Intelligence Global Licensing, LLC is a corporation organized under the laws of Delaware.

5.     Rovi assigned the following patents to MOV Intelligence: U.S. Patent Nos. 7,299,209; 6,510,516; 6,802,006; 7,650,504; 6,813,640; 7,650,418; 7,200,230; 7,124,114; 6,381,367; 6,374,036; 6,360,000; 6,553,127; 6,701,062; 6,594,441; 7,764,790; 8,014,524; 6,931,536; and International Patent Nos. DE60047794; DE60148635.8; DE60211372.5; DE69901231.7-08; DK1047992; EP1047992; EP1303802; EP1332618; EP1444561; ES1047992; FR1047992; FR1303802; FR1332618; FR1444561; GB1047992; GB1303802; GB1332618; GB1444561; GR3040059; IE1047992; IE1444561; IT1047992; NL1047992; NL1444561; PT1047992; and SE1047992.

6.     MOV Intelligence has the right to sublicense the following international patent assets held by Rovi: AT1020077; AT1198959; AT1080584; ATE232346; AT1020077;

---

[2] *See* U.S. Patent Nos. 6,381,367; 7,764,790; 6,701,062; 8,014,524; German Patent Nos. DE60001837 and DE60001837D1; Chinese Patent No. CN1186941C; Canadian Patent No. CA2379992C; European Patent No. EP1198959B1; and Japanese Patent No. JP4387627B2.

[3] Wolfram Schrag, *EU-Patent steht auf der Kippe*, BR.COM NACHRICHTEN (August 2016).

AU729762; AU741281; AU753421; AU743639; AU714103; AU729762; AU2002351508; AU765747; AU2000263715; BE1020077; BE1198959; BE1020077; BE1080584; BE900498; BRPI 9812908-2; BR9709332.7; BRPI 9812908-2; CA2305254; CA2332546; CA2379992; CA2305254; CA2332548; CA2557859; CA2252726; CA2462679; CA2315212; CA2416304; CA2425115; CH1020077; CH1080584; CH900498; CH1020077; CH1047992; CNZL98809610.2; CNZL99806376.2; CNZL00811179.0; CNZL98809610.2; CNZL99806377.0; CNZL97194746.5; CNZL02820738.6; CNZL99802008.7; CNZL00819775.X; CNZL200510089437; DE69807102.608; DE60001837.7; DE69908352.4-08; DE69718907.4-08; DE69807102.608; DK1020077; DK1080584; DK1198959; DK1020077; DK900498; EP1020077; EP1198959; EP1080584; EP900498; EP1020077; ES1020077; ES1198959; ES1080584; ESES2191844; ES1020077; FI1020077; FI1080584; FI1020077; FI900498; FR1020077; FR1198959; FR1080584; FR900498; FR1020077; GB1020077; GB1198959; GB1080584; GB900498; GB1020077; GR3041381; GR3045620; GR3043304; GR3041381; HK1028696; HKHK1035625; HK1028696; HK1035282; HK1018562; HKHK1069234; HKHK1057115; HK1083653B; IE1020077; IE1198959; IE1020077; IE1080584; IE900498; IL135498; IL139543; IL148002; IL135498; IL139544; IN201442; IN220504; IN201442; IN207829; IT1020077; IT1080584; IT900498; IT1020077; JP4139560; JP4263706; JP4387627; JP4551617; JP4139560; JP4263706; JP3542557; JP4627809; JP4698925; JP4366037; JP4307069; KR374920; KR422997; KR761230; KR374920; KR362801; KR478072; KR689648; KR539987; KR752067; KR728517; KR593239; MX223464; MX231725; MX226464; MX223464; MX212991; MX214637; MX237690; MX240845; MYMY-123159-A; MYMY-123159-A; NL1020077; NL1198959; NL1080584; NL900498; NL1020077; NZ503280; NZ507789; NZ503280; NZ532122; PT1010077; PT1198959; PT1080584; PT900498; PT1010077; RU2195084; RU2216121; RU2251821; RU2195084; RU2208301; RU2258252; SE1020077; SE1198959; SE1080584; SE900498; SE1020077; SG71485; SG76965; SG86547; SG76964; SG71485; TWNI117461; TWNI-

124303; TWNI-130428; TWNI1600674; TWNI-162661; TWNI-202640; TWNI117461; TWNI-130754; and TWNI-184111.

**NEC**

7.      On information and belief, NEC Corporation is a corporation organized and existing under the laws of the Japan with a principal place of business at 7-1, Shiba 5-chome Minato-ku, Tokyo 108-8001 Japan.

8.      On information and belief, NEC Corporation of America is a Nevada corporation with a principal place of business at 6535 State Highway 161, Irving, Texas 75039.  NEC may be served through its registered agent National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  On information and belief, NEC conducts business operations within the Eastern District of Texas.

## JURISDICTION AND VENUE

9.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

10.      Upon information and belief, this Court has personal jurisdiction over NEC in this action because NEC has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over NEC would not offend traditional notions of fair play and substantial justice. NEC, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), has committed and continues to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the patents-in-suit. In addition, Defendant NEC is registered to do business in the State of Texas.

11.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).  NEC is registered to do business in Texas, and upon information and belief, has transacted business in

the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas.

## MOV INTELLIGENCE'S LANDMARK INVENTIONS

12.     The groundbreaking inventions in DRM and digital watermarking taught in the patents-in-suit were pioneered by Rovi.  Rovi, established in 1983 under the name Macrovision, was a trailblazing technology company focused on inventing and bringing to market fundamental technologies designed to allow producers and distributors of film and music to widely distribute their products while simultaneously protecting their art from unauthorized copying.[4] Macrovision's copy protection technology became so important to content creators that Congress specifically regulated the manufacture and sale of technology that was incompatible with Macrovision's copy protection technology.  *See* 17 U.S.C. § 1201(k)(1) ("unless such recorder conforms to the automatic gain control copy control technology").[5]  Rovi broadened its focus to include copy protection and DRM for other media,[6] including computer executables, firmware, operating system images, watermarking, and encryption.

13.     MOV Intelligence's patent portfolio, which includes more than 233 issued patents worldwide, is a direct result of Rovi's substantial investment in research and development.  The

---

[4] Aljean Harmetz, *Cotton Club Cassettes Coded to Foil Pirates*, N.Y. TIMES (April 24, 1985).

[5] *See also* David Nimmer, *Back from the Future: A Proleptic Review of the Digital Millennium Copyright Act*, 16 BERKELEY TECH. L.J. 855, 862 (2001) (The DMCA "contains a welter of corporation-specific features, relating to Macrovision Corp.  The features in question relate to section 1201's controls on consumer analog devices.") (citations omitted).

[6] *See* Michael Arnold et al., TECHNIQUES AND APPLICATIONS OF DIGITAL WATERMARKING AND CONTENT PROTECTION 203 (2002) (Describing Rovi's Cactus Data Shield product which by 2002 had been used in over 100 million compact discs.  "This scheme [Rovi Cactus Data Shield] operates by inserting illegal data values instead of error-correcting codes."); *see also Rovi SafeDisc Copy Protection Overview*, MACROVISION CORPORATION DATASHEET at 2 (1999) ("SafeDisc incorporates a unique authentication technology that prevents the re-mastering of CD-ROM titles and deters attempts to make unauthorized copies.  The SafeDisc authentication process ensures that consumers will only be able to play original discs.  The user is forced to purchase a legitimate copy."); Kirby Kish, MACROSAFE SYSTEM: A SOLUTION FOR SECURE DIGITAL MEDIA DISTRIBUTION at 7 (January 2002) (showing the architecture of the MacroSafe system and use of a DRM Server and Key Escrow Server).

asserted MOV Intelligence patents are reflective of this history of innovation, embodying a

number of firsts in the development of DRM and watermarking technologies.

14.     MOV Intelligence long-term financial success depends in part on its ability to

establish, maintain, and protect its proprietary technology through patents.  Defendant's

infringement presents significant and ongoing damage to MOV Intelligence's business.  NEC, in

an effort to expand its product base and profit from the sale of patented technology, has chosen

to incorporate MOV Intelligence's fundamental technology without a license or payment.

**THE ASSERTED PATENTS**

**U.S. PATENT NO. 6,802,006**

15.     U.S. Patent No. 6,802,006 (the "'006 patent"), entitled "System and Method of

Verifying the Authenticity of Dynamically Connectable Executable Images," was filed on July

22, 1999, and claims priority to January 15, 1999.  MOV Intelligence is the owner by assignment

of the '006 patent.  A true and correct copy of the '006 patent is attached hereto as Exhibit A.

The '006 patent claims specific methods and systems for verifying the authenticity of executable

images.  The system includes a validator that determines a reference digital signature for an

executable image using the contents of the executable image excluding those portions of the

executable that are fixed-up by a program loader.  The validator then, subsequent to the loading

of the executable image, determines an authenticity digital signature to verify that the executable

image has not been improperly modified.

16.     The '006 patent has been cited by over 85 issued United States patents and

published patent applications as relevant prior art.  Specifically, patents issued to the following

companies have cited the '006 patent as relevant prior art:

- Intertrust Technologies Corporation
- International Business Machines Corporation
- Intel Corporation
- Microsoft Corporation
- Check Point Software Technologies, Inc.
- Nokia Corporation
- Ipass, Inc.

- Nytell Software LLC
- Amazon Technologies, Inc.
- Panasonic Corporation
- Matsushita Electric Ind. Co. Ltd.
- NXP B.V. (now Cisco Systems, Inc.)
- Intel Corporation
- Hewlett-Packard Development Company, L.P.
- Apple, Inc.
- Lockheed Martin Corporation
- Symantec Corporation
- Zone Labs, Inc.

17.     The '006 patent claims a technical solution to a problem unique to computer systems: verifying and authenticating executable images.

**U.S. PATENT NO. 6,510,516**

18.     U.S. Patent No. 6,510,516 (the "'516 patent"), entitled "System and Method for Authenticating Peer Components," was filed on January 15, 1999, and claims priority to January 16, 1998.  MOV Intelligence is the owner by assignment of the '516 patent.  A true and correct copy of the '516 patent is attached hereto as Exhibit B.  The '516 patent claims specific methods and systems for controlling the usage of data objects in component object systems.  According to the invention, each data object includes a peer list that defines one or more peer data objects that are required by the data object.  Upon receipt of a data object, the system verifies the integrity of the data object.  Further, the system identifies the integrity of the peer data objects.

19.     The '516 patent family has been cited by over 108 issued United States patents and published patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '516 patent as relevant prior art:

- America Online, Inc.
- LG Electronics, Inc.
- Microsoft Corporation
- Samsung Electronics Co., Ltd.
- First Data Corporation
- International Business Machines Corporation
- Pixar, Inc. (now a subsidiary of the Walt Disney Company)
- Adobe Systems Incorporated
- The Western Union Company

- Verizon Communications, Inc.
- JPMorgan Chase & Co.
- Electronics and Telecommunications Research Institute (ETRI)
- Siemens Medical Solutions USA, Inc.

## U.S. PATENT NO. 7,650,504

20.     U.S. Patent No. 7,650,504 (the "'504 patent"), entitled "System and Method of Verifying the Authenticity of Dynamically Connectable Executable Images," was filed on August 23, 2004, and claims priority to July 22, 1999.  MOV Intelligence is the owner by assignment of the '504 patent.  A true and correct copy of the '504 patent is attached hereto as Exhibit C.  The '504 patent claims specific methods and systems for verifying the authenticity of executable images.  The systems and methods taught in the '504 patent incorporate a validator that determines a reference digital signature for an executable image using the contents of the executable image excluding those portions of the executable that are fixed-up by a program loader.  The validator then, subsequent to the loading of the executable image, determines an authenticity digital signature to verify that the executable image has not been improperly modified.  In addition, the validator ensures that each of the pointers in the executable image have not been improperly redirected.

21.     The '504 patent and its underlying application have been cited by over 30 issued United States patents and published patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '504 patent as relevant prior art:

- Qualcomm Incorporated
- Intel Corporation
- Micro Beef Technologies, Ltd
- Microsoft Corporation
- Apple, Inc.
- Symantec Corporation
- Samsung Electronics Co., Ltd.
- Cybersoft Technologies, Inc.
- Electronics and Telecommunications Research Institute (ETRI)

22.     The '504 patent claims a technical solution to a problem unique to the transmission of digital information over a network: verifying the identity of a software

application in a dynamic loading environment.  In particular, the system determines whether a software application that has been dynamically connected to another data object has been tampered with subsequent to the execution of the software application.

**U.S. PATENT NO. 7,650,418**

23.     U.S. Patent No. 7,650,418 (the "'418 patent"), entitled "System and Method for Controlling the Usage of Digital Objects," was filed on August 26, 2004, and claims priority to December 8, 1998.  MOV Intelligence is the owner by assignment of the '418 patent.  A true and correct copy of the '418 patent is attached hereto as Exhibit D.  The '418 patent claims specific methods and systems for controlling the usage of digital objects wherein control rights associated with a digital data object activate an external control object and an intercept application to intercept and monitor communications between a hosting application and a document server application associated with the creation of the digital data object.  The '418 patent teaches the use of intercepting and monitoring functions without affecting or changing the hosting application or the document server application.  The external control object activates an intercept application which mimics the functions of the document server application and performs user actions on the digital data object as authorized by the external control object according to the control rights associated with the digital object.  By intercepting and monitoring user actions on a digital data object, the invention can control access and use of the digital data object.

24.     The '418 patent family has been cited by over 47 issued United States patents and published patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '418 patent as relevant prior art:

- Google, Inc.
- Fisher-Rosemount Systems, Inc.
- Knoa Software, Inc.
- Securewave S.A.
- International Business Machines Corporation
- Ab Initio Technology LLC
- The Invention Science Fund I, LLC
- Searete LLC
- Microsoft Corporation

25.     The '418 patent claims a technical solution to a problem unique to the transmission of digital information over a network: reliably controlling the usage of digital objects wherein the system and/or methods intercept the communication between two applications communicating over a computer network.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 6,802,006

26.     MOV Intelligence references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

27.     NEC designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for determining the authenticity of an executable image.

28.     NEC designs, makes, sells, offers to sell, imports, and/or uses the NEC MasterScope Suite, which includes: DeploymentManager Ver6.5, DeploymentManager Ver5.4, DeploymentManager Ver6.3, DeploymentManager Ver6.2, SigmaSystemCenter 3.5, SigmaSystemCenter 3.4, and SigmaSystemCenter 3.3 (collectively, the "NEC '006 Product(s)").

29.     On information and belief, one or more NEC subsidiaries and/or affiliates use the NEC '006 Products in regular business operations.

30.     On information and belief, one or more of the NEC '006 Products include authentication technology.

31.     On information and belief, one or more of the NEC '006 Products enable authenticating the identity of a software application in a dynamic loading environment.  In particular, the NEC '006 Products determine whether an executable image has been dynamically connected to another data object that has been tampered with subsequent to the execution of the software application.

32.     On information and belief, the NEC '006 Products are available to businesses and individuals throughout the United States.

33.     On information and belief, the NEC '006 Products are provided to businesses and individuals located in the Eastern District of Texas.

34.     On information and belief, the NEC '006 Products enable identifying one or more locations within the executable image, each of the identified locations being modified by a program loader.

35.     On information and belief, the NEC '006 Products comprise a system wherein a reference digital signature is generated based on an executable image.

36.     On information and belief, the NEC '006 Products generate a reference digital signature that excludes one or more locations in an executable image.

37.     On information and belief, the NEC '006 Products are capable of storing the reference digital signature on a computer network.

38.     On information and belief, the NEC '006 Products comprise systems and methods wherein an authenticity digital signature is generated based on an executable image.

39.     On information and belief, the NEC '006 Products comprise systems and methods that generate an authenticity digital signature that excludes one or more locations in an executable image.

40.     On information and belief, the NEC '006 Products comprise systems and methods that determine whether the authenticity digital signature matches the reference digital signature.

41.     On information and belief, the NEC '006 Products contain functionality that generates a warning if the reference digital signature does not match the authenticity digital signature.

42.     On information and belief, the NEC '006 Products contain functionality wherein the digital signature is generated based on a first and second point in time.  For example, one or more of the NEC '006 Products generate a reference digital signature at a first point in time. Subsequently, an authenticity digital signature is generated (at a second point in time).

43.     On information and belief, the NEC '006 Products comprise a system and method that generates a digital signature based on a hash value.  Specifically, the reference digital

signature that is generated by the NEC '006 Products at a first point in time is based on a hash value.  Later the authenticity digital signature is also generated based on a hash function that is used to check data integrity.

44.     On information and belief, the NEC '006 Products comprise a system and method that can verify the identity a computer application.

45.     On information and belief, the NEC '006 Products enable the detection of corrupted data in a computer image.

46.     On information and belief, the NEC '006 Products enable the verification of the integrity of software images.

47.     On information and belief, NEC has directly infringed and continues to directly infringe the '006 patent by, among other things, making, using, offering for sale, and/or selling content protection technology, including but not limited to the NEC '006 Products, which includes technology for verifying the authenticity of a software image.  Such products and/or services include, by way of example and without limitation, the NEC MasterScope Suite, which includes: DeploymentManager Ver6.5, DeploymentManager Ver5.4, DeploymentManager Ver6.3, DeploymentManager Ver6.2, SigmaSystemCenter 3.5, SigmaSystemCenter 3.4, and SigmaSystemCenter 3.3.

48.     By making, using, testing, offering for sale, and/or selling verification and authentication products and services, including but not limited to the NEC '006 Products, NEC has injured MOV Intelligence and is liable to MOV Intelligence for directly infringing one or more claims of the '006 patent, including at least claims 1, 3, 14, and 15, pursuant to 35 U.S.C. § 271(a).

49.     On information and belief, NEC also indirectly infringes the '006 patent by actively inducing infringement under 35 USC § 271(b).

50.     On information and belief, NEC had knowledge of the '006 patent since at least service of this Complaint or shortly thereafter, and on information and belief, NEC knew of the '006 patent and knew of its infringement, including by way of this lawsuit.

51.     On information and belief, NEC intended to induce patent infringement by third-party customers and users of the NEC '006 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  NEC specifically intended and was aware that the normal and customary use of the accused products would infringe the '006 patent.  NEC performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '006 patent and with the knowledge that the induced acts would constitute infringement.  For example, NEC provides the NEC '006 Products that have the capability of operating in a manner that infringe one or more of the claims of the '006 patent, including at least claims 1, 3, 14, and 15, and NEC further provides documentation and training materials that cause customers and end users of the NEC '006 Products to utilize the products in a manner that directly infringe one or more claims of the '006 patent.  By providing instruction and training to customers and end-users on how to use the NEC '006 Products in a manner that directly infringes one or more claims of the '006 patent, including at least claims 1, 3, 14, and 15, NEC specifically intended to induce infringement of the '006 patent.  On information and belief, NEC engaged in such inducement to promote the sales of the NEC '006 Products, *e.g*., through NEC user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '006 patent.  Accordingly, NEC has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '006 patent, knowing that such use constitutes infringement of the '006 patent.

52.     The '006 patent is well-known within the industry as demonstrated by the over 85 citations to the '006 patent in issued patents and published patent applications assigned to technology companies and academic institutions.  Several of NEC's competitors have paid considerable licensing fees for their use of the technology claimed by the '006 patent.  In an effort to gain an advantage over NEC's competitors by utilizing the same licensed technology without paying reasonable royalties, NEC infringed the '006 patent in a manner best described as

willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

53.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '006 patent.

54.     As a result of NEC's infringement of the '006 patent, MOV Intelligence has suffered monetary damages, and seeks recovery in an amount adequate to compensate for NEC's infringement, but in no event less than a reasonable royalty for the use made of the invention by NEC together with interest and costs as fixed by the Court.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 6,510,516

55.     MOV Intelligence references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

56.     NEC designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for authenticating peer data objects.

57.     NEC designs, makes, sells, offers to sell, imports, and/or uses the NEC Univerge - Unified Communications & Collaboration Suite, including: Univerge SV9500, Univerge SV9300, Univerge SV9100, Univerge 3C, Univerge BX1000, Univerge BX800, and Univerge BX9000 (collectively, the "NEC '516 Product(s)").

58.     On information and belief, one or more NEC subsidiaries and/or affiliates use the NEC '516 Products in regular business operations.

59.     On information and belief, one or more of the NEC '516 Products include authentication technology.

60.     On information and belief, one or more of the NEC '516 Products enable authenticating the identity of peers to a data object.

61.     On information and belief, the NEC '516 Products are available to businesses and individuals throughout the United States.

62.     On information and belief, the NEC '516 Products are provided to businesses and individuals located in the Eastern District of Texas.

63.     On information and belief, the NEC '516 Products enable first data objects to contain or be linked to a description of one or more peer data objects that are required to be connected to the first data object before the data object can be accessed by the peer data objects.

64.     On information and belief, the NEC '516 Products enable the use of a digital signature that identifies the provider of a data object.

65.     On information and belief, the NEC '516 Products contain systems and methods that comprise reading from a data object a description of one or more peer data objects that is required for use of the data object.

66.     On information and belief, the NEC '516 Products contain functionality for determining whether the data object is authorized to communicate with one or more peer data objects.

67.     On information and belief, the NEC '516 Products contain the capability to determine if the data object is authorized to communicate with one or more peer data objects.

68.     On information and belief, the NEC '516 Products are capable of controlling the connection of the peer data objects to the data object.

69.     On information and belief, the NEC '516 Products comprise systems and methods that connect a data object to peer data objects based upon authorization being granted. Moreover, when authorization is granted for the connection of a data object to peer data objects the peer data objects can communicate with the data object and the data object can communicate with the peer data objects.

70.     On information and belief, the NEC '516 Products support authenticating a data object where the data object is encrypted.

71.     On information and belief, NEC has directly infringed and continues to directly infringe the '516 patent by, among other things, making, using, offering for sale, and/or selling data object authentication and verification technology, including but not limited to the NEC '516

Products, which include infringing verification and authentication technologies.  Such products and/or services include, by way of example and without limitation, the NEC Univerge - Unified Communications & Collaboration Suite, including: Univerge SV9500, Univerge SV9300, Univerge SV9100, Univerge 3C, Univerge BX1000, Univerge BX800, and Univerge BX9000.

72.     By making, using, testing, offering for sale, and/or selling authentication and verification products and services, including but not limited to the NEC '516 Products, NEC has injured MOV Intelligence and is liable to MOV Intelligence for directly infringing one or more claims of the '516 patent, including at least claims 1, 17, and 20, pursuant to 35 U.S.C. § 271(a).

73.     On information and belief, NEC also indirectly infringes the '516 patent by actively inducing infringement under 35 USC § 271(b).

74.     On information and belief, NEC had knowledge of the '516 patent since at least service of this Complaint or shortly thereafter, and on information and belief, NEC knew of the '516 patent and knew of its infringement, including by way of this lawsuit.

75.     On information and belief, NEC intended to induce patent infringement by third-party customers and users of the NEC '516 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  NEC specifically intended and was aware that the normal and customary use of the accused products would infringe the '516 patent.  NEC performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '516 patent and with the knowledge that the induced acts would constitute infringement.  For example, NEC provides the NEC '516 Products that have the capability of operating in a manner that infringe one or more of the claims of the '516 patent, including at least claims 1, 17, and 20, and NEC further provides documentation and training materials that cause customers and end users of the NEC '516 Products to utilize the products in a manner that directly infringe one or more claims of the '516 patent.  By providing instruction and training to customers and end-users on how to use the NEC '516 Products in a manner that directly infringes one or more claims of the '516 patent, including at least claims 1, 17, and 20, NEC specifically intended to induce

infringement of the '516 patent.  On information and belief, NEC engaged in such inducement to promote the sales of the NEC '516 Products, e.g., through NEC user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '516 patent.  Accordingly, NEC has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '516 patent, knowing that such use constitutes infringement of the '516 patent.

76.    The '516 patent is well-known within the industry as demonstrated by the over 108 citations to the '516 patent family in issued patents and published patent applications assigned to technology companies and academic institutions (*e.g.*, LG Electronics, Inc. and Siemens AG).  Several of NEC's competitors have paid considerable licensing fees for their use of the technology claimed by the '516 patent.  In an effort to gain an advantage over NEC's competitors by utilizing the same licensed technology without paying reasonable royalties, NEC infringed the '516 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

77.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '516 patent.

78.    As a result of NEC's infringement of the '516 patent, MOV Intelligence has suffered monetary damages, and seeks recovery in an amount adequate to compensate for NEC's infringement, but in no event less than a reasonable royalty for the use made of the invention by NEC together with interest and costs as fixed by the Court.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 7,650,504

79.    MOV Intelligence references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

80.    NEC designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for verifying the authenticity of executable images.

81.     NEC designs, makes, sells, offers to sell, imports, and/or uses the NEC MasterScope Suite, which includes: DeploymentManager Ver6.5, DeploymentManager Ver5.4, DeploymentManager Ver6.3, DeploymentManager Ver6.2, SigmaSystemCenter 3.5, SigmaSystemCenter 3.4, and SigmaSystemCenter 3.3 (collectively, the "NEC '504 Product(s)").

82.     On information and belief, one or more NEC subsidiaries and/or affiliates use the NEC '504 Products in regular business operations.

83.     On information and belief, one or more of the NEC '504 Products include authentication technology.

84.     On information and belief, one or more NEC '504 Products comprise systems and methods for determining the authenticity of an executable image.

85.     On information and belief, one or more NEC '504 Products enable authenticating and verifying an executable image.  In particular, the NEC '504 Products determine whether a software application that has been dynamically connected to another data object has been tampered with subsequent to the execution of the software application.

86.     On information and belief, the NEC '504 Products are available to businesses and individuals throughout the United States.

87.     On information and belief, the NEC '504 Products are provided to businesses and individuals located in the Eastern District of Texas.

88.     On information and belief, the NEC '504 Products enable the use of a reference digital signature for an executable image.  The reference digital signature uses the contents of the executable image excluding portions of the executable that are fixed-up by a program loader.

89.     On information and belief, the NEC '504 Products comprise a system wherein a reference digital signature is generated based on an executable image.

90.     On information and belief, the NEC '504 Products generate a reference digital signature that excludes one or more locations in an executable image.

91.     On information and belief, the NEC '504 Products comprise systems and methods wherein subsequent to the loading of the executable image the '504 Products determine an

authenticity digital signature to verify that the executable image has not been improperly modified.

92.     On information and belief, the NEC '504 Products comprise systems and methods that generate an authenticity digital signature that excludes one or more locations in an executable image.

93.     On information and belief, the NEC '504 Products are systems and methods that generate an authenticity digital signature after the executable image is loaded into memory.  The authenticity digital signature which is generated by the NEC '504 Products excludes one or more pointers in need of fixing up;

94.     On information and belief, the NEC '504 Products comprise systems and methods that determine whether the authenticity digital signature matches the reference digital signature.

95.     On information and belief, the NEC '504 Products enable the generating of a reference digital signature prior to loading the executable image into memory.  Specifically, the NEC '504 Products generate a reference digital signature that excludes one or more pointers from the reference digital signature.

96.     On information and belief, the NEC '504 Products contain functionality wherein the digital signature is generated based on a first and second point in time.

97.     On information and belief, the NEC '504 Products have the ability to compare the reference digital signature and the authenticity digital signature to perform an authenticity check.

98.     On information and belief, the NEC '504 Products enable the detection of corrupted data in a computer image.

99.     On information and belief, the NEC '504 Products enable the verification of the integrity of software images.

100.     On information and belief, NEC has directly infringed and continues to directly infringe the '504 patent by, among other things, making, using, offering for sale, and/or selling content protection technology, including but not limited to the NEC '504 Products, which includes technology for verifying the authenticity of a software image.  Such products and/or

services include, by way of example and without limitation, the NEC MasterScope Suite, which includes: DeploymentManager Ver6.5, DeploymentManager Ver5.4, DeploymentManager Ver6.3, DeploymentManager Ver6.2, SigmaSystemCenter 3.5, SigmaSystemCenter 3.4, and SigmaSystemCenter 3.3.

101.    By making, using, testing, offering for sale, and/or selling authentication and verification technologies and services, including but not limited to the NEC '504 Products, NEC has injured MOV Intelligence and is liable to MOV Intelligence for directly infringing one or more claims of the '504 patent, including at least claims 1 and 10, pursuant to 35 U.S.C. § 271(a).

102.    On information and belief, NEC also indirectly infringes the '504 patent by actively inducing infringement under 35 USC § 271(b).

103.    On information and belief, NEC had knowledge of the '504 patent since at least service of this Complaint or shortly thereafter, and on information and belief, NEC knew of the '504 patent and knew of its infringement, including by way of this lawsuit.

104.    On information and belief, NEC intended to induce patent infringement by third-party customers and users of the NEC '504 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  NEC specifically intended and was aware that the normal and customary use of the accused products would infringe the '504 patent.  NEC performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '504 patent and with the knowledge that the induced acts would constitute infringement.  For example, NEC provides the NEC '504 Products that have the capability of operating in a manner that infringe one or more of the claims of the '504 patent, including at least claims 1 and 10, and NEC further provides documentation and training materials that cause customers and end users of the NEC '504 Products to utilize the products in a manner that directly infringe one or more claims of the '504 patent.  By providing instruction and training to customers and end-users on how to use the NEC '504 Products in a manner that directly infringes one or more claims of the

'504 patent, including at least claims 1 and 10, NEC specifically intended to induce infringement of the '504 patent.  On information and belief, NEC engaged in such inducement to promote the sales of the NEC '504 Products, e.g., through NEC user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '504 patent.  Accordingly, NEC has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '504 patent, knowing that such use constitutes infringement of the '504 patent.

105.    The '504 patent is well-known within the industry as demonstrated by the over 30 citations to the '504 patent family in issued patents and published patent applications assigned to technology companies and academic institutions (*e.g.*, Apple, Inc. and Electronics and Telecommunications Research Institute (ETRI)).  Several of NEC's competitors have paid considerable licensing fees for their use of the technology claimed by the '504 patent.  In an effort to gain an advantage over NEC's competitors by utilizing the same licensed technology without paying reasonable royalties, NEC infringed the '504 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

106.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '504 patent.

107.    As a result of NEC's infringement of the '504 patent, MOV Intelligence has suffered monetary damages, and seeks recovery in an amount adequate to compensate for NEC's infringement, but in no event less than a reasonable royalty for the use made of the invention by NEC together with interest and costs as fixed by the Court.

## COUNT IV
## INFRINGEMENT OF U.S. PATENT NO. 7,650,418

108.    MOV Intelligence references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

109.    NEC designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for controlling the usage of digital objects.

110.    NEC designs, makes, sells, offers to sell, imports, and/or uses the NEC Univerge - Unified Communications & Collaboration Suite, including: Univerge SV9500, Univerge SV9300, Univerge SV9100, Univerge 3C, Univerge BX1000, Univerge BX800, and Univerge BX9000 (collectively, the "NEC '418 Product(s)").

111.    On information and belief, one or more NEC subsidiaries and/or affiliates use the NEC '418 Products in regular business operations.

112.    On information and belief, one or more of the NEC '418 Products comprise systems and methods for intercepting a communication between two applications in a computer environment.

113.    On information and belief, one or more of the NEC '418 Products enable intercepting a communication between two applications where the first and second application communicate via a predefined communications channel.

114.    On information and belief, the NEC '418 Products are available to businesses and individuals throughout the United States.

115.    On information and belief, the NEC '418 Products are provided to businesses and individuals located in the Eastern District of Texas.

116.    On information and belief, the NEC '418 Products include systems and methods that comprise a discreet intercept technology component (DIT) and a dynamic connection logic component (DCL).

117.    On information and belief, the NEC '418 Products comprise systems and methods wherein the DIT component permits the interception of communication and data flows between two or more components in component-based applications.

118.    On information and belief, the NEC '418 Products enable the DIT component to be inserted between two digital components.  The DIT then intercepts the data and communications, thereby controlling the communication between the two digital components.

119.     On information and belief, the NEC '418 Products comprise systems and methods that enable a control object capable of specifying a dynamic control logic depending on the intercepted data communication.

120.      On information and belief, the NEC '418 Products enable applying by the intercept application the dynamic control logic specified by the control object on the digital object.

121.     On information and belief, the NEC '418 Products contain functionality for intercepting data communication between a first application and a second application within a computer network without changing the functionality of the first application and the second application.

122.     On information and belief, NEC has directly infringed and continues to directly infringe the '418 patent by, among other things, making, using, offering for sale, and/or selling digital rights technology, including but not limited to the NEC '418 Products, which include infringing technology for controlling the usage of data objects.  Such products and/or services include, by way of example and without limitation, the NEC Univerge - Unified Communications & Collaboration Suite, including: Univerge SV9500, Univerge SV9300, Univerge SV9100, Univerge 3C, Univerge BX1000, Univerge BX800, and Univerge BX9000.

123.     By making, using, testing, offering for sale, and/or selling digital rights management products and services, including but not limited to the NEC '418 Products, NEC has injured MOV Intelligence and is liable to MOV Intelligence for directly infringing one or more claims of the '418 patent, including at least claims 1, 2, 4, 7, 8, and 9, pursuant to 35 U.S.C. § 271(a).

124.     On information and belief, NEC also indirectly infringes the '418 patent by actively inducing infringement under 35 USC § 271(b).

125.     On information and belief, NEC had knowledge of the '418 patent since at least service of this Complaint or shortly thereafter, and on information and belief, NEC knew of the '418 patent and knew of its infringement, including by way of this lawsuit.

126.     On information and belief, NEC intended to induce patent infringement by third-party customers and users of the NEC '418 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  NEC specifically intended and was aware that the normal and customary use of the accused products would infringe the '418 patent.  NEC performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '418 patent and with the knowledge that the induced acts would constitute infringement.  For example, NEC provides the NEC '418 Products that have the capability of operating in a manner that infringe one or more of the claims of the '418 patent, including at least claims 1, 2, 4, 7, 8, and 9, and NEC further provides documentation and training materials that cause customers and end users of the NEC '418 Products to utilize the products in a manner that directly infringe one or more claims of the '418 patent.  By providing instruction and training to customers and end-users on how to use the NEC '418 Products in a manner that directly infringes one or more claims of the '418 patent, including at least claims 1, 2, 4, 7, 8, and 9, NEC specifically intended to induce infringement of the '418 patent.  On information and belief, NEC engaged in such inducement to promote the sales of the NEC '418 Products, e.g., through NEC user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '418 patent.  Accordingly, NEC has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '418 patent, knowing that such use constitutes infringement of the '418 patent.

127.     The '418 patent is well-known within the industry as demonstrated by the over 47 citations to the '418 patent family in issued patents and published patent applications assigned to technology companies and academic institutions (*e.g.*, Google, Inc. and International Business Machines Corporation).  Several of NEC's competitors have paid considerable licensing fees for their use of the technology claimed by the '418 patent.  In an effort to gain an advantage over NEC's competitors by utilizing the same licensed technology without paying reasonable

royalties, NEC infringed the '418 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

128.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '418 patent.

129.    As a result of NEC's infringement of the '418 patent, MOV Intelligence has suffered monetary damages, and seeks recovery in an amount adequate to compensate for NEC's infringement, but in no event less than a reasonable royalty for the use made of the invention by NEC together with interest and costs as fixed by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff MOV Intelligence respectfully requests that this Court enter:

A.    A judgment in favor of Plaintiff MOV Intelligence that NEC has infringed, either literally and/or under the doctrine of equivalents, the '006 patent, the '516 patent, the '504 patent, and the '418 patent;

B.    An award of damages resulting from NEC's acts of infringement in accordance with 35 U.S.C. § 284;

C.    A judgment and order finding that Defendant's infringement was willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate within the meaning of 35 U.S.C. § 284 and awarding to Plaintiff enhanced damages.

D.    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Plaintiff its reasonable attorneys' fees against Defendant.

E.    Any and all other relief to which MOV Intelligence may show itself to be entitled.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, MOV Intelligence requests a trial by jury of any issues so triable by right.

Dated:  October 6, 2016                Respectfully submitted,

/s/  Dorian S. Berger_____
Elizabeth L. DeRieux (TX Bar No. 05770585)
D. Jeffrey Rambin (TX Bar No. 00791478)
CAPSHAW DERIEUX, LLP
114 E. Commerce Ave.
Gladewater, Texas 75647
Telephone: 903-845-5770
E-mail: ederieux@capshawlaw.com
E-mail: jrambin@capshawlaw.com

Dorian S. Berger (CA SB No. 264424)
Daniel P. Hipskind (CA SB No. 266763)
BERGER & HIPSKIND LLP
1880 Century Park East, Ste. 815
Los Angeles, CA 95047
Telephone: 323-886-3430
Facsimile: 323-978-5508
E-mail: dsb@bergerhipskind.com
E-mail: dph@bergerhipskind.com

*Attorneys for Marking Object Virtualization Intelligence, LLC*